# Third District Court of Appeal

## State of Florida

Opinion filed September 7, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D15-1523, 3D15-2104 & 3D15-1007
Lower Tribunal No. 12-42509

_____


**Burger King Corporation,**
Appellant,

vs.

**Angel Luis Lastre-Torres,**
Appellee.



Appeals from the Circuit Court for Miami-Dade County, Jorge E. Cueto, Judge.

Rumberger, Kirk & Caldwell, P.A., Candy L. Messersmith, David B. Shelton and Robert V. Fitzsimmons (Orlando), for appellant.

Keith Chasin, for appellee.


Before ROTHENBERG, EMAS and FERNANDEZ, JJ.

FERNANDEZ, J.

Burger King Corporation appeals a final judgment entered in favor of Angel Luis Lastre-Torres. We affirm the final judgment except for the award of past and future medical expenses as those were excessive and not supported by the undisputed evidence. See Aircraft Serv. Int'l, Inc. v. Jackson, 768 So. 2d 1094, 1096 (Fla. 3d DCA 1995) (stating that "[a]wards exceeding [a] definite and ascertainable amount are readily vacated and remanded"). Accordingly, upon remand the trial court is instructed to reduce the past medical expenses to $4,026.35 and the future medical expenses $24,024. In all other regards, we affirm.

Affirmed in part, reversed in part and remanded.

ROTHENBERG, J. (concurring).

Although I agree that the judgment entered in favor of the plaintiff, Angel Luis Lastre-Torres ("the plaintiff"), should be affirmed but reduced based on our reversal of the amount awarded for past and future medical expenses, I write separately to address and record the exceptionally improper closing arguments made by the plaintiff's trial counsel. As will be demonstrated below, counsel's closing arguments were racially and ethnically charged and were made in an effort to invoke sympathy for the plaintiff and anger towards the seemingly uncaring corporate defendant, Burger King. The only reason this case has not been reversed and remanded for a new trial is because these improper arguments sailed by without objection by opposing counsel or intervention by the trial court.

## Summary of the Case

The plaintiff, who was employed by a cleaning service that had a contract with Burger King to clean equipment at Burger King's restaurants, was injured when a degreaser he was using to clean the hood of a fryer dripped into his eye. The plaintiff claimed that, although he had asked for a face mask several times prior to his injury, no mask had been provided. Although several witnesses who testified on behalf of Burger King disputed the plaintiff's claim, testifying that

3

weekly inspections were made and that all of the safety equipment, including the subject mask was present at that location, the jury concluded otherwise, and we are not free to substitute our opinion on such factual matters for that of the trier of fact. Teichner & Mella, P.A. v. Butler By and Through Fulton, 600 So. 2d 507, 508 (Fla. 3d DCA 1992).

The jury ultimately returned a verdict in favor of the plaintiff and awarded him $931,000 in damages.  A breakdown of the damages is as follows: $29,000 for past medical expenses; $52,000 for future medical expenses; $50,000 for past pain and suffering; and $800,000 for future pain and suffering.  Because the jury apportioned 90% of the liability to Burger King, the final judgment entered against Burger King was in the amount of $837,900.  Burger King timely moved for remittitur and for a new trial, both of which were denied by the trial court and are before this Court on appeal.  Attorney's fees and costs in the amounts of $92,185 and $6,962.40, respectively, were also awarded based on the plaintiff's offer of judgment.

The majority reverses the trial court's order denying Burger King's motion for remittitur of the past medical expenses as the undisputed evidence reflects that these expenses totaled $4,026.35, and thus the jury's award of $29,000 for past medical expenses was unsupported by the evidence and was clearly excessive. We, therefore, reverse that portion of the trial court's order denying Burger King's

4

motion for a remittitur for the past medical expenses, and order a reduction to $4,026.35 in accordance with the evidence introduced at trial. Similarly, the trial court erred by also denying Burger King's motion for remittitur as to the plaintiff's future medical expenses as the evidence regarding those expenses does not support the jury's $52,000 award. The plaintiff's expert testified that the plaintiff's future medical expenses attributed to the sued-for injury equaled $24,024.[1] Therefore, the future medical expenses must be reduced to $24,024. I concur with both of these findings, and with the conclusion affirming the remainder of the damages.

<u>The Plaintiff's Closing Arguments</u>

The plaintiff, who was born in Cuba, and only speaks Spanish, testified at trial through an interpreter. The jury was primarily comprised of Hispanics. The plaintiff's theme throughout his closing arguments focused on the difficulty that first-generation Americans allegedly face upon entering the work force in America. Plaintiff's counsel, Mr. Chasin, argued that first-generation Americans are forced to endure tough physical labor under the harshest of conditions, and because of these conditions, they are people of great integrity and honesty and, therefore, they

---

[1] The plaintiff's expert opined that the plaintiff will need a prosthetic eye, which will cost $2,000, and it will cost him $600 a year for 40.04 years to have it polished, equaling $24,024. As the plaintiff's expert explained, other costs, such as eye exams and sunglasses, were costs the plaintiff would have incurred without the 2010 injury to the plaintiff's eye because the plaintiff had previously injured that eye during a childhood accident in Cuba. The eye was essentially a non-functioning eye prior to the Burger King injury—the plaintiff could only see "shadows" out of that eye.

should be believed and, of course, the jury should feel sympathy for first-generation Americans.

> MR. CHASIN: What justice will you give to my client? Do you believe him? Do you think he has integrity? Do you think he's determined? Do you think he's a warrior? Do you think he's everything that this country is about? I said, when I met you on Monday, we're all, unless you're a Native American Indian, we're all first-generation from somewhere.
>
> My grandpa drove a truck to get potatoes for two hours in the morning and at night, and then expanded it to get fruits and vegetables. Everyone was first-generation, and you know what the first generation does if they don't come over here with an education and the ability to speak our language? They use physical labor, and they work hard and they work at what is available to them.
>
> Lord knows who would have wanted to do what [the plaintiff] did. A porter in a Burger King from the eleven p.m. to five a.m. shift, rode his bicycle from Hialeah to Overtown, through a pretty rough part of town, get on a step ladder 12-feet high, put - - use this degreaser to clean grease off the hoods of the Burger King restaurant for the [sic] little pay, and he did it seven nights a week. Regardless of what you think of [the plaintiff], he had integrity and determination and he is this country. He is our first generation.

The plaintiff's counsel argued that the plaintiff was a first-generation American, and because he was a first-generation American, when he was told to degrease the hoods at the Overtown Burger King, he did what he was told because he had no choice. "[L]ike a good soldier, he does. Did he have a choice? Who knows, who cares? That's what the first-generation does." Counsel then compared the plaintiff's working conditions to those suffered by Chinese-Americans when building the railroad out West and to the immigrants who were

6

forced to work in "sweat shops," and interjected personal non-record anecdotal commentary.

> The harsh conditions that the first generation goes through, they do it all for the second and third generations. So my grandfather did it for his son, my father, and me. We know what the first generation went through. They built a railroad out west, Chinese Americans met in the middle. There were sweat shops. There were terrible conditions. Look at the conditions that [the plaintiff] was subjected to.
> . . . .
> Imagine if the first generation walks off the job? What happens to them? They don't have rights. They don't have money. You think they're going to hire a lawyer and sue for lost wages? **Your verdict is all about the first generation, people. It's really what it is**.

(emphasis added).

These highly improper arguments suggested that the plaintiff had been subjected to what amounted to as slave labor by a corporate defendant who took advantage of the plaintiff's plight. Counsel for the plaintiff then explicitly mis-directed the jury from its task to weigh the evidence fairly and dispassionately to determine if the plaintiff had proved that Burger King had breached its duty to the plaintiff, to instead reach a verdict based on their sympathy and/or empathy for immigrants, who the plaintiff's counsel repeatedly referred to as first-generation Americans.

Following his sympathy-invoking rhetoric directed towards the plaintiff, counsel moved on to attacking the credibility of Burger King's witnesses by literally comparing Burger King's witnesses to a highly publicized deadly shooting

7

of a black man in South Carolina the day before. The incident plaintiff's counsel referred to was a police shooting of an unarmed black man who had been running from the officer. Plaintiff's counsel told the jury that the officer had denied the truth of what happened that evening until someone produced a videotape of the incident. Plaintiff's counsel then suggested that Burger King's witnesses were lying because there was no videotape to prove otherwise, and suggested that if there had been a videotape taken on the night the plaintiff was injured, it would have substantiated the plaintiff's testimony that there was no face mask.

> I was going to talk to you about the headline in yesterday's Miami Herald where, unfortunately, a policeman shot a gentleman in South Carolina, and the policeman denied what happened until someone produced a videotape. You may have read it in the paper, and the videotape says it all. I am not suggesting that there should be a videotape at this Burger King, but I am suggesting to you when you look at [the plaintiff] and you see where is his integrity? Do you believe him? If you saw a videotape of what happened that evening, sight unseen, do you really think you'd see a face mask there?
>
> . . . .
>
> Do you honestly think he got on a ladder and said: Hey, I'm not going to take another two minutes to wear that face mask, I like getting this degreaser on my skin and my face? There's no one there. He's got the whole night to clean the restaurant. You know what I think? I think someone suggests that, give me a break. Because if you do, if you think that, I could do triple back flips and I'll never convince you otherwise because I don't have a videotape. Just like what happened in South Carolina. Without the videotape, you can't prove a thing. It's essentially [the plaintiff's] word versus [Burger King's witnesses]. Face mask was not there, she said it was.

Lastly, plaintiff's counsel argued to the jury in Spanish that Burger King was treating the plaintiff as though he was stupid and a liar and that they, the jury, should "[g]ive this worker some rights. Don't treat him as if he's stupid, doesn't know what he's doing, he's a liar and he's better off."

Although plaintiff's counsel on appeal, who was also trial counsel, characterizes his closing arguments as "fair and balanced," these types of arguments have long been condemned. See e.g., Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1028 (Fla. 2010) (holding that closing arguments that appeal to racial, ethnic, or religious prejudices are the types of arguments that traditionally require a new trial); City of Orlando v. Pineiro, 66 So. 3d 1064, 1069 (Fla. 5th DCA 2011) (noting that the court has long cautioned attorneys against resorting to inflammatory, prejudicial argument); Chin v. Caiaffa, 42 So. 3d 300, 308-09 (Fla. 3d DCA 2010) (recognizing that while partisan zeal is permissible in closing arguments, that zeal must be confined to the evidence and attorneys must guard against arguments that impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury); SDG Dadeland Assoc., Inc. v. Anthony, 979 So. 2d 997, 1002 (Fla. 3d DCA 2008) (finding that it is wholly improper for an attorney to offer his own opinion regarding the evidence); Muhammad v. Toys "R" Us, Inc., 668 So. 2d 254, 258 (Fla. 1st DCA 1996) (holding that, when counsel related anecdotal commentary about his wife and

9

daughter to the evidence in the case, comparing his wife and daughter's experiences to the plaintiff's situation, trial counsel "pushed the envelope of propriety," and "[s]uch irrelevant familial rhetoric must not be condoned"); E. S.S. Lines, Inc. v. Martial, 380 So. 2d 1070 (Fla. 3d DCA 1980) (noting that remarks made solely for the purpose of evoking sympathy for the plaintiff are clearly improper).

However, none of these improper arguments were objected to by Burger King's trial counsel, and thus Burger King must establish fundamental error to obtain a new trial on this ground. Under a fundamental error analysis, Burger King must, however, demonstrate that not only were the arguments improper and harmful, but also that they were incurable. Murphy, 766 So. 2d at 1010. Burger King has failed to meet its burden in this regard. The unobjected-to improper arguments were not only curable, they were preventable. As soon as plaintiff's counsel embarked on his crusade to canonize his client and vilify the evil corporate defendant, there should have been an objection, a request for a curative instruction, a motion for a new trial, and a request for the trial court to admonish the plaintiff's counsel that such arguments would not be permitted. If the trial court overruled the objections and the plaintiff's counsel continued to make these improper objected-to arguments, then Burger King would have been able to obtain its preserved right to a new trial.

The Florida Supreme Court and this Court have repeatedly cautioned trial counsel to confine his or her arguments to the evidence and issues at trial, not to use closing argument to inflame the jury, and not to themselves comment on the evidence or the credibility of the witnesses. In Murphy, 766 So. 2d at 1028, the Florida Supreme Court stated the following:

> The purpose of closing argument is to help the jury understand the issues in a case by "applying the evidence to the law applicable to the case." Hill v. State, 515 So. 2d 176, 178 (Fla. 1987). Attorneys should be afforded great latitude in presenting closing argument, but they must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts in evidence." Knoizen v. Bruegger, 713 So. 2d 1071, 1072 (Fla. 5th DCA 1998); . . . Moreover, closing argument must not be used to "inflame the minds and passion of the jurors so that their verdict reflects an emotional response . . . rather than the logical analysis of the evidence in light of the applicable law." Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985).

In the instant case, the plaintiff's counsel vouched for the credibility of the plaintiff; injected personal anecdotal commentary about his own family, which he related to the plaintiff's plight; improperly told the jury that their verdict was "all about the first-generation," which he characterized as hard-working honest people with integrity who are forced, due to their circumstances, to work in sweat shops, to build railroads, and to perform other back-breaking labor with "no rights." The plaintiff's counsel also suggested that Burger King was a callous corporate employer which failed to provide the necessary safety equipment based on corporate greed. These arguments were improper and would have warranted a

11

reversal had Burger King's counsel timely objected and had the trial court either overruled the objections or failed to cure the prejudice.

Although I concur with the majority opinion, I have written this concurring opinion to remind counsel that all lawyers who practice in this State are governed by the Rules Regulating The Florida Bar, and specifically Rule 4-3.4, and that even when offending impermissible closing arguments do not result in a reversal because the objectionable arguments were not objected to and did not result in fundamental error, counsel's actions may be sanctionable by the Florida Bar. We additionally remind opposing counsel and trial court judges to be vigilant and mindful of their own responsibility to protect the fairness of the proceeding and the integrity of the system.